**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**

**CIVIL ACTION NO. 08-46-C**

**JOSEPH W. JOHNSTON,**                                                    **PLAINTIFF,**

**V.**                                    **MEMORANDUM OPINION AND ORDER**

**GREYHOUND LINES, INC., ET AL.,**                              **DEFENDANTS.**

**\* \* \* \* \* \* \* \* \* \* \***

This matter is before the court upon the plaintiff's motions for partial summary judgment (R. 46) and to certify class (R. 90) and the defendants' motion for summary judgment (R. 86).  The court will deny the plaintiff's motions and will grant in part and deny in part the defendants' motion.  As a result of these rulings, the court will dismiss the case and enter judgment for the defendants.

I.      **Background**

The plaintiff, Joseph W. Johnston, retired from Greyhound Lines, Inc. on September 1, 2005.  He is a participant in the Greyhound Lines, Inc. - Amalgamated Transit Union National Local 1700 Retirement and Disability Plan ("the Plan").  Following his retirement, he initially received a monthly pension benefit of $1,580.86.  Johnston discovered that the Plan had not included any incentive pay or bonuses that he had earned when it calculated his monthly pension benefit.  On September 12, 2005, he requested that the Plan provide a detailed calculation of his monthly benefits.  In a letter dated October 4, 2005, the Plan manager explained that the Plan had never considered any type of bonus as part of the "pensionable earnings used to compute

average final earnings." R. 46-4. Johnston appealed the Plan manager's calculation of his "average final earnings" to the Plan's Board of Trustees on October 18, 2005. At its October 26, 2005, meeting, the Board tabled Johnston's appeal for further review. In a letter dated March 9, 2006, the Board stated that it "has no authority to rule on this matter. Greyhound Lines, Inc. ("GLI") sets the policy for pensionable earnings for retirement benefits." R. 66-2. The Board also referred Johnston to Harry Clark, Jr., GLI's vice president of human resources. A representative of GLI responded to Johnston's letter and informed the Board that it was mistaken in redirecting the request to GLI. The Board then denied Johnston's claim based on the Plan's policy of excluding bonuses and incentive pay from the calculation of pension benefits.

Approximately one year later, the Plan manager advised Johnston that the Plan had completed an audit relating to how it pays benefits to participants who have benefit service covered by the Plan and the Greyhound Lines, Inc. Salaried Employees Defined Benefit Pension Plan ("Salaried Plan"). The Plan determined that some participants were not paid in accordance to a reciprocal agreement between the two plans. In particular, it "incorrectly discontinued counting years after an individual transferred to a nonbargaining unit position," which resulted in increased benefits for those participants. R. 46-3. The Plan manager notified Johnston that his monthly pension would be reduced to $1,139.54 and that he was required to repay the amount of $8,385.08, which the Plan had paid him in error. *Id.* Johnston appealed the Plan's decision to reduce his benefits on April 24, 2007. In a letter dated July 30, 2007, the

Board denied his appeal.

On January 17, 2008, Johnston filed this action solely on his own behalf, alleging that the defendants (1) failed to calculate his monthly pension benefit based upon his total cash compensation; (2) improperly used his total employment service in calculating the reciprocity ratio; (3) improperly amended the Plan to include the provisions of the reciprocal agreement; and (4) interfered with his assertion of rights to benefits under the terms of the Plan.  He then amended the complaint on July 9, 2008, to assert claims on behalf of all others similarly situated in addition to his personal claims, and he filed a second amended complaint on November 24, 2008.

The court held a hearing on the plaintiff's motion for partial summary judgment on March 23, 2009.  At the hearing, the plaintiff made a judicial admission that the reciprocal agreement is valid.  The court also denied without prejudice the plaintiff's first motion to certify class.

## II.    Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment

The court will grant the defendants' motion for summary judgment on Counts I, II, and III.  Since Count IV already has been dismissed, the court will deny as moot the motion for summary judgment on that count.  The court will deny the plaintiff's motion for partial summary judgment.

### A.    Count III - Validity of the Reciprocal Agreement

The plaintiff alleges that the reciprocal agreement is invalid in Count III of the second amended complaint.  R. 57, at 13-14.  However, at the hearing on his motion

3

for partial summary judgment, counsel for the plaintiff made a judicial admission that the reciprocal agreement is valid.  R. 87.  Judicial admissions are "generally treated as binding" and "dispense with the need to offer proof on facts about which there is no real dispute."  *Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC*, 477 F.3d 383, 394 (6th Cir. 2007) (internal citations and quotations omitted).  Because of the plaintiff's judicial admission, the defendants are entitled to judgment as a matter of law on Count III.

**B.    Standard of Review for Counts I and II**

The court must apply the arbitrary-and-capricious standard of review in order to determine whether the defendants erred.  This standard "is the least demanding form of judicial review of administrative action."  *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) (internal quotation marks and citations omitted).  Typically, when an ERISA plan "gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the court must review the plan administrator's decision using an arbitrary-and capricious standard of review.  *Id.* at 168.  In the instant action, the parties agree that the Plan contains language that grants the plan administrator discretionary authority.

In applying this standard, the court must determine "whether, in light of the plan's provisions, the plan administrator's decision was rational."  *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 292 (6th Cir. 2005).  "[W]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome

4

is not arbitrary or capricious." *McDonald*, 347 F.3d at 169 (internal quotation marks and citations omitted).

While the plaintiff acknowledges that the Plan grants the defendants discretionary authority, he claims that the defendants' actions have effectively waived any deferential review. The plaintiff makes several arguments in support of a *de novo* review, but none of them are valid.[1] Thus, the court will apply the arbitrary-and-capricious standard of review to evaluate the defendants' decisions.

## C. Count I - Calculation of Final Average Earnings

The defendants are entitled to a judgment as a matter of law on Count I because their failure to include bonuses or incentive pay in the calculation of the plaintiff's average final earnings was not arbitrary and capricious. Under the Plan, as restated on March 15, 2002, "Average Final Earnings" are "[t]he average monthly Earnings of the last five (5) years as an Employee . . . ."[2] R. 54-3, at 3. "Earnings" are defined as "[t]he total cash remuneration paid or payable to an Employee by an Employer

---

[1] Even though the defendants' decision was untimely, that alone does not preclude discretionary review. *Daniel v. Eaton*, 839 F.2d 263, 267 (6th Cir. 1988) ("the standard of review is no different whether the appeal is actually denied or deemed denied"). In addition, while the Board initially thought that GLI was responsible for deciding the issues in the plaintiff's appeal, GLI informed the Board that it was mistaken. The Board then remedied its mistake by rendering a decision. Because the Board, and not a third party, exercised its discretion in deciding the appeal, the decision is entitled to deference.

[2] The Plan lists several options for calculating "Average Final Earnings." The option quoted applies to the plaintiff, and both parties used it in their respective supporting memoranda. For the purpose of the instant motion, the differences in the various options are inconsequential.

during any period of Participating Service, including any salary reductions or deferrals . . . , but excluding any reimbursement or allowances for expenses."[3]  R. 54-3, at 6. Clearly, the definition of "Earnings" does not exclude bonuses or incentive pay. Nevertheless, the court's inquiry cannot end here.  Because "Earnings" are limited to cash paid or payable "during any period of Participating Service," the court must determine whether the bonuses that the plaintiff received as a salaried employee were paid during that time.

"Participating Service" is "[t]he sum of a Participant's "Participating Service" under the Prior Plans . . . and a Participant's Benefit Service credited under this Plan." R. 54-3, at 14.  A "Participant" is "[a]n individual with an Accrued Benefit hereunder, who shall be categorized as either "Active" or "Inactive" in accordance with Section 2. hereof."  Under the Plan, "[o]nly Active Participants shall be credited with Benefit Service in accordance with the provisions of this Section 2.3(2)[,]" R. 54-3, at 19, and "[o]nly an Active Participant shall be eligible to accrue a benefit hereunder for Benefit Service performed for an Employer[,]" R. 54-3, at 18.  When an "Active Participant terminates employment with an Employer and thereupon loses his seniority under the

---

[3] In the Summary Plan Descriptions from March 19, 1987, and January 1, 1998, "Earnings" were defined as "the total cash compensation paid to you plus any salary reductions or deferrals . . . .  Earnings do not include any reimbursement or allowances for expenses."  R. 46-3, at 6 and 9.  While this definition does not expressly limit an employee's earnings to those earned "during any period of Participating Service," that limitation can be found elsewhere in the document.  For example, the Summary Plan Description states that "[o]nly Active Participants can earn Benefit Service under this Plan."  *Id.*  Thus, the same limitations to "Earnings" apply regardless of whether the court uses the definition found in the Summary Plan Description or the one found in the restated Plan document.

Collective Bargaining Agreement . . .[he or she] shall thereafter cease to be an Active Participant regardless of whether such Participant is subsequently reemployed by an Employer . . . ." R. 54-3, at 18. The Plan notes that "[t]ermination of employment would also include the discontinuation of or transfer from employment in a job classification within a bargaining unit . . . even though the Participant continues to be an Employee or is subsequently employed or reemployed in a nonbargaining unit job classification. . . ." R. 54-3, at 18.

When Johnston took a salaried position on August 1, 1989, he "terminate[d] employment" for purposes of the Plan. Thus, he lost his status as an "Active Participant" as well as his right to "accrue a benefit . . . for Benefit Service." "Benefit Service" is "[t]he period of a Participant's employment considered in determining the amount of benefit accrual for or on behalf of such Participant." R. 54-3, at 9. Therefore, under the Plan document, Johnston had no right to have any compensation that he earned as a salaried employee, regardless of whether it was base salary, bonuses, or incentive pay, credited for the purposes of determining his "Average Final Earnings."

Even though Johnston is not entitled to receive credit for his compensation as a salaried employee through the Plan document, he still can receive credit for that compensation under a reciprocal agreement between the Plan and the Salaried Plan. The two plans entered into the reciprocal agreement in order to "allocat[e] the costs of pensioners on a basis consistent with the plan or plans under which such

7

contributions [were] made."   R. 54-4, at 3.   The reciprocal agreement covers employees that transferred from a position covered by one plan to a position covered by the other plan.  R. 54-4, at 3.  Employees affected by the reciprocal agreement "will have their pensions determined on a *pro rata* basis for each Plan involved and each Plan will pay a separate proportional pension benefit based on the months of service under each Plan bears to the total aggregate service of the employee."  R. 54-4, at 4.  "Each plan will pay such *pro rata* pension based on its own rules and regulations in effect at the time that the employee files an application for pension benefits[,]" and "applicable earnings of the employee will be used to determine benefits, whether or not earned under the jurisdiction of another Trust."  R. 54-4, at 4.

In order for Johnston to receive credit for his bonuses and incentive pay under the reciprocal agreement, they must be considered "applicable earnings."  However, the reciprocal agreement does not define "applicable earnings," and nothing in the agreement provides insight as to how to determine what can or cannot be considered "applicable earnings."  Because the meaning of "applicable earnings" is ambiguous, the court will give deference to the Plan's interpretation of the term.  *See Moos v. Square D Co.*, 72 F.3d 39, 42 (6th Cir. 1995) ("[W]e grant plan administrators who are vested with discretion in determining eligibility for benefits great leeway in interpreting ambiguous terms."); *Jones v. Metro Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) ("At the outset, we note that because the Plan expressly granted to MetLife authority

8

to interpret the Plan, we must give deference to MetLife's interpretation of ambiguous and general terms of the Plan."). According to the Plan manager, "[h]istorically, pensionable earnings used to compute average final earnings have never included any type of bonus." R. 66-2, at 1. Even though the Plan manager used the term "average final earnings" his explanation implicitly reveals that the Plan interpreted "applicable earnings" to exclude bonuses and incentive payments.[4] Because this is a reasonable interpretation of an ambiguous term in the Plan documents, the defendants' decision was not arbitrary and capricious.

The court need not apply the rule of *contra proferentem* and construe any ambiguities against the drafting parties as suggested in *University Hospitals*, 202 F.3d at 846-47. Instead, when the language of a plan is not altogether clear, the "deference to be accorded the [Pension] Board in the administration of its plan requires the court to stay its hand in the interest of efficient pension administration." *Moos v. Square D Co.*, 72 F.3d 39, 42 (6th Cir. 1995) (quoting *Cook v. Pension Plan for Salaried Employees of Cyclops Corp.*, 801 F.2d 865, 871 (6th Cir. 1986)). The Sixth Circuit has recognized that *University Hospitals* mistakenly applied *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 557 n. 7 (6th Cir. 1998) (en banc), which involved a question regarding "whether the plan granted the administrator discretionary authority to make

---

[4] The Plan manager made this statement in a letter dated October 4, 2005, that was sent to Johnston in response to his request for an explanation of the calculation of his average final earnings. The letter was sent before any litigation commenced. Therefore, the defendants' interpretation is not an after-the-fact rationale.

benefits determinations – not whether, in exercising such authority, the administrator properly resolved an ambiguity in the plan documents," and determined that "the rule stated in *Moos* – a decision that preceded *University Hospitals* – is correct in light of *Firestone Tire & Rubber Co. v. Bruch*." *Smiljanich v. General Motors Corp.*, 182 Fed. App'x 480, 486 n. 2 (6th Cir. 2006). Even though *Smiljanich* is an unpublished decision, its reasoning is persuasive. Furthermore, a "prior decision [of the Sixth Circuit] remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or [the Sixth Circuit] sitting *en banc* overrules the prior decision." *Darrah v. City of Oak Park, Michigan*, 255 F.3d 301, 309-310 (6th Cir. 2001) (quoting *Salmi v. Sec'y of Health and Human Services*, 774 F.2d 685, 689 (6th Cir. 1985); *see also* 6th Cir. R. 206(c) ("Reported panel opinions are binding on subsequent panels. Thus, no subsequent panel overrules a published opinion of a previous panel. Court *en banc* consideration is required to overrule a published opinion of the court."). This court, therefore, remains bound by *Moos* and must give deference to the defendants' interpretation of the ambiguous term, "applicable earnings."

**D.    Count II - Calculation of Reciprocity Ratio**

The court will grant summary judgment for the defendants on Count II because their calculation of the plaintiff's reciprocity ratio, which determines the percentage of

10

his pension that the Plan must pay, was not arbitrary and capricious.[5]   Under the reciprocal agreement, "Employees . . . will have their pensions determined on a *pro rata* basis for each Plan involved and each Plan will pay a separate proportional pension benefit based on the proportion that the months of service under each Plan bears to the total aggregate service of the employee." R. 54-4, at 4.   The parties agree that Johnston has 339 months of service under the Plan.   Their dispute concerns the determination of the plaintiff's "total aggregate service."   Johnston argues that "total aggregate service" should be calculated by adding his months of service under the Plan (339 months) and his months of service under the Salaried Plan (5 months), which results in a "total aggregate service" of 344 months.   The defendants disagree and contend that "total aggregate service" means "the total number of months during which the salaried employee was receiving earnings that are being counted for purposes of calculating the employee's [average final earnings]." R. 54, at 17.   Using the defendants' method, Johnston's "total aggregate service" would be 490 months.

The reciprocal agreement does not define "total aggregate service."   Because of this ambiguity, the court must defer to the Plan's interpretation. *Moos*, 72 F.3d at 42; *Jones*, 385 F.3d at 661.   The defendants' interpretation enables the plaintiff to enhance his pension by including the compensation that he earned as a salaried

---

[5] The defendants' calculation of the plaintiff's monthly pension benefits does not result in a decreasing pension benefit.   The application of the reciprocal agreement enhances the plaintiff's pension by allowing him to include income from the time he served as a salaried employee.   The reciprocity ratio is then applied to ensure that the Plan is liable only for its *pro rata* share of the pension.

employee through March 15, 2002, which is higher than his compensation during the time that he was an hourly employee.  The defendants also interpret the reciprocal agreement to allow the Plan to count the plaintiff's years of service as an employee through March 15, 2002, in determining his "total aggregate service" so that the Plan will be liable only for its proportional share of the plaintiff's pension.  This reasoning is rational and supported by the Plan documents.  Furthermore, it fulfills the reciprocal agreement's purpose of "allocating costs of pensioners on a basis consistent with the plan or plans under which such contributions are made."  R. 54-4, at 3.

The plaintiff's interpretation of the reciprocal agreement would impose an unreasonable burden upon the Plan.  Johnston seeks to require the Plan to include the higher salary that he earned as a salaried employee through March 15, 2002, in his average final earnings while at the same time limiting the Plan's ability to include his months of service through March 15, 2002, in his total aggregate service.  The plaintiff's assertion that the Plan should use only the five months that he was covered under the Salaried Plan would create the unjust result of holding the Plan liable for 98.55% of Johnston's enhanced pension.[6]

The plaintiff cannot rely on judicial estoppel to support his claim.  Judicial

---

[6] Even though Johnston retired on September 1, 2005, the Plan was "frozen" on March 15, 2002, and his ability to accrue benefit service ended at the time.  He became a salaried employee on August 1, 1989, and the Salaried Plan was "frozen" five months later.  Johnston seeks to limit his "total aggregate service" to the number of months that he accrued time under the Plan plus the five months that he earned credit under the Salaried Plan.

estoppel prevents a party "from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding." *Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469, 472-73 (6th Cir. 1988) (citations omitted).  Because the defendants did not submit the voluntary compliance resolution to the Internal Revenue Service during a "prior proceeding," judicial estoppel is inapplicable.  Further, the defendants' position in the voluntary compliance resolution is not inconsistent with its position in the instant action.  The defendants simply explained that they had incorrectly calculated the benefits for several beneficiaries by not applying the reciprocity ratio, and they continue to assert that argument in the instant action.

Similarly, the plaintiff cannot bind the defendants to an interpretation based on mistakes contained in internal administrative documents and operating procedures. The defendants acknowledge that these documents are inconsistent with their current position.  The employees of the Plan, not the Board, misunderstood an amendment to the Plan and, without Board approval, incorporated their mistake into the administrative documents and procedures.  After an audit revealed these problems, the Board took steps to remedy them.  No authority supports the proposition that the Plan must remain bound by its employees' misinterpretation of Plan documents.  Therefore, the actions taken by the defendants to correct the employees' mistakes were not arbitrary and capricious.  Although the defendants did not use the term "aggregate service" in their correspondence with Johnston in regard to his claim, the Board's

13

correction of the miscalculations made by employees of the Plan show that its interpretation of the Plan was not based on an after-the-fact rationale.

## III.   Motion to Certify Class

Because the court has granted summary judgment for the defendants, the plaintiff has no claims upon which to base his second motion to certify class.  Hence, the motion is moot and must be denied.

## IV.   Conclusion

Accordingly,

**IT IS ORDERED** that the plaintiff's motion for partial summary judgment (R. 46) and motion to certify class (R. 90) are **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (R. 86) is **GRANTED IN PART** and **DENIED IN PART AS MOOT** in accordance with this opinion.  Counts I, II, and III of the second amended complaint are **DISMISSED**.

**IT IS FURTHER ORDERED** that this matter shall be **STRICKEN** from the court's active docket.

Signed on  June 30, 2009

*Jennifer B. Coffman*

**Jennifer B. Coffman, Judge**
**United States District Court**

14